UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DARIUS DUBARRY, HARRY RIVERA,
*and* JAYQUAN GRIFFIN, on behalf of
themselves and all others similarly situated,

Plaintiffs,

v.

ANTHONY ANNUCCI, JEFF McKOY,
MICHAEL CAPRA, LESLIE MANN,
STEPHEN BRANDOW, JPAY INC., JOHN
DOE REVIEWING OFFICER #1, JOHN
DOE REVIEWING OFFICER #2, JOHN
DOE REVIEWING OFFICER #3, *and* JOHN
DOE CENTRAL OFFICE REVIEW
COMMITTEE MEMBERS,

Defendants.

No. 21-CV-5487 (KMK)

OPINION & ORDER

Appearances:

Darius Dubarry
Harry Rivera
Jayquan Griffin
Ossining, NY
*Pro se Plaintiffs*

Kathryn E. Martin, Esq.
Office of the New York Attorney General
White Plains, NY
*Counsel for Defendants Anthony Annucci, Jeff McKoy, Michael Capra, Leslie Malin, & Stephen Brandow*

Colleen Smeryage, Esq.
Constantine Economides, Esq.
Devin Freedman, Esq.
Miami, FL
*Counsel for Defendant JPay, Inc.*

KENNETH M. KARAS, United States District Judge:

Darius Dubarry ("Dubarry"), Harry Rivera ("Rivera"), and Jayquan Griffin ("Griffin"; together, "Plaintiffs"), proceeding pro se, bring this Action against Anthony Annucci ("Annucci"), Jeff McKoy ("McKoy"), Michael Capra ("Capra"), Leslie Malin ("Malin"), Stephen Brandow ("Brandow"; together with Annucci, McKoy, Capra, and Malin, "DOCCS Defendants"), JPay, Inc. ("JPay"), John Doe Reviewing Officer #1, John Doe Reviewing Officer #2, John Doe Reviewing Officer #3, and John Doe Central Office Review Committee Members (collectively, "Defendants"), pursuant to 42 U.S.C. § 1983, alleging that Defendants violated their rights under the First and Fourteenth Amendments by instituting and enforcing a department-wide policy of denying inmates nude photographs and videos on secure tablet devices. (*See generally* Compl. (Dkt. No. 2).)  Before the Court are DOCCS Defendants' Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("DOCCS Defendants' Motion") and JPay's Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("JPay's Motion"; together, the "Motions").  (*See* DOCCS Defs.' Not. of Mot. (Dkt. No. 51); JPay's Not. of Mot. (Dkt. No. 53).)  For the following reasons, the Motions are granted.

## I.  Background

### A.  Materials Considered

As a threshold matter, the Court determines the proper treatment of a number of exhibits attached to both DOCCS Defendants' Motion and Plaintiff's Opposition.  Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56."  *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002).  "Nevertheless, the Court's

consideration of documents attached to, or incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Id.*; *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety . . . , documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken." (alteration omitted) (quoting *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993))). "Moreover, 'where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint.'" *Alvarez v. County of Orange*, 95 F. Supp. 3d 385, 394 (S.D.N.Y. 2015) (alteration omitted) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). The rules are more flexible with respect to motions to dismiss pro se complaints, in which "it is appropriate to consider materials outside the complaint to the extent that they are consistent with the allegations in the complaint, including documents that a pro se litigant attaches to his opposition papers." *Ceara v. Deacon*, 68 F. Supp. 3d 402, 405 (S.D.N.Y. 2014) (quotation marks and citations omitted); *see also Rivera v. Westchester Cnty.*, 488 F. Supp. 3d 70, 76 (S.D.N.Y. 2020) (similar).

DOCCS Defendants have attached three exhibits to their Motion, which they argue are both incorporated by reference into and are integral to the Complaint: (1) Department of Corrections and Community Supervision ("DOCCS") Directive No. 4425, governing the Inmate Tablet Program, (*see* DOCCS Defs.' Mem. of Law in Supp. of Mot. ("DOCCS Defs.' Mem.")

3

(Dkt. No. 52) Ex. A (Dkt. No. 52-1)); (2) Malin's denial of Plaintiffs' consolidated grievance, (*see* DOCCS Defs.' Mem. Ex. B (Dkt. No. 52-2)); and (3) the Central Office Review Committee's ("CORC") denial of Plaintiffs' grievance appeal, (*see* DOCCS Defs.' Mem. Ex. C (Dkt. No. 52-3)).  "To be incorporated by reference, the complaint must make a clear, definite, and substantial reference to the documents, and to be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." *Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *5 (S.D.N.Y. Sept. 30, 2015) (alterations omitted) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012)); *see also Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017) ("Generally, a court may incorporate documents referenced where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed." (emphasis omitted) (collecting cases)).  Plaintiffs clearly relied on all three documents in framing the Complaint and all three documents are clearly and substantially referenced in the Complaint. (*See* Compl. 6–11.)[1]  Moreover, Plaintiffs do not appear to object to the Court's consideration of these materials, having put them before the Court in their Opposition.  (*See* Stmt. of Undisputed Facts (Dkt. No. 59) Exs. B, D, M.)

Plaintiffs have attached a total of 15 exhibits to their Opposition, which Plaintiffs argue that the Court may consider due to their status as pro se plaintiffs.  (*See* Stmt. of Undisputed

---

[1] While Plaintiffs' Complaint does include numbered paragraphs, certain paragraph numbers are repeated. (*See, e.g.*, Compl. 8–9 (listing paragraphs in the following order: ¶¶ 30, 31, 32, 33, 34, 32, 33, 34.)  Therefore, when citing to the Complaint, the Court instead refers to its page numbers.

Facts Exs. A–O; Pls.' Mem. of Law in Opp'n to Mots. ("Pls.' Mem.") 6–7 (Dkt. No. 58).)

Plaintiffs are, of course, correct that the Court may consider "documents that . . . pro se

litigant[s] attach[] to [their] opposition papers," *Ceara*, 68 F. Supp. 3d at 406 (quotation marks

omitted), and thus, the Court will consider these documents here.  However, Plaintiffs are

cautioned not to abuse this flexibility going forward.  Despite the liberal treatment courts are

instructed to afford to pro se litigants' papers, "pro se litigants generally are required to inform

themselves regarding procedural rules and to comply with them." *Edwards v. I.N.S.*, 59 F.3d 5, 8

(2d Cir. 1995) (italics omitted).  If Plaintiffs submit an amended complaint in the future,

Plaintiffs should attach any documents that they wish for the Court to consider to the amended

complaint, to allow Defendants an adequate opportunity to review the entirety of Plaintiffs'

allegations and to consider the arguments that might be available (or not available) to Defendants

before filing any motions to dismiss.

    B.  Factual Background

    The following facts are taken from Plaintiffs' Complaint, (*see* Compl.), and are assumed

to be true for the purposes of ruling on the instant Motion.  *See Div. 1181 Amalgamated Transit

Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per

curiam).  Where relevant, the Court also recounts facts from the various other materials the Court

has ruled it may consider at this stage.

    Plaintiffs are currently—and at all times relevant to the instant Action have been—

inmates of Sing Sing Correctional Facility ("Sing Sing"), located in Ossining, New York.  (*See

Compl. 3, 4.)  DOCCS Defendants are each supervisory officials employed by DOCCS: Annucci

is the Acting Commissioner of DOCCS, McKoy is the Deputy Commissioner of DOCCS,

Brandow is the Deputy Commissioner of Administrative Services of DOCCS, Capra is the

Superintendent of Sing Sing, and Malin is the Deputy Superintendent of Programs at Sing Sing.

5

(*See id.* at 5.)  JPay is a private entity that has contracted with DOCCS to provide media services to inmates confined in DOCCS facilities via tablet devices.  (*See id.* at 5–6.)

Plaintiffs allege that between December 2019 and April 2021, Plaintiffs were each sent a number of videograms and photographs from individuals outside of Sing Sing via their respective tablet devices, which were reviewed and rejected by John Doe Reviewing Officers #1, #2, and #3 pursuant to DOCCS Directive Nos. 4425 and 4572.[2]  (*See* Compl. 6–11.)  DOCCS Directive No. 4425 "contains and describes the policies and procedures governing the tablet program available to inmates in general population," which is designed for, inter alia, "the opportunity to use a secure messaging system to communicate with family and friends as approved by [DOCCS]."  (DOCCS Defs.' Mem. Ex. A, at §§ I, II.)  As part of the program, DOCCS provides to each inmate a tablet device at no cost, which the inmate can connect to one of several kiosks located in common areas of DOCCS facilities to download a selection of materials, some of which have an associated cost, using his or her password-protected kiosk account.  (*See id.* §§ III, IV.A.)  Inmates are not permitted to share tablets, kiosk accounts, or passwords.  (*See id.* §§ IV.B., IV.E.)  Inmates using their tablets for secure messaging are required to comply with applicable DOCCS policies; further, all secure messages are subject to content screening by authorized staff, who may reject messages and associated attachments that violate DOCCS policies.  (*See id.* §§ IV.J., IV.K., IV.L.)  When a message is rejected, the sender of the message—whether he or she is an inmate or civilian—is notified of the rejection.  (*See id.* §§ IV.K., IV.L.)

---

[2] A videogram is defined by DOCCS Directive No. 4425 as "[a] 30-second video clip recorded by a community member and sent to an inmate as a secure message."  (DOCCS Defs.' Mem. Ex. A, at § III.K.)

DOCCS Directive No. 4572 sets forth some of the policies that govern published material and the procedures by which DOCCS evaluates and either approves or disapproves of such published material.  (*See* Stmt. of Undisputed Facts Ex. N.)  As relevant to the instant dispute, DOCCS Directive No. 4572 prohibits publications "which contain child pornography"; which "depict[] nude children in a non-pornographic context but . . . could promote or encourage prurient interest in the sexual performance of children"; and "which, taken as a whole, by the average person applying contemporary standards, appeal to prurient interest, and which depict or describe in a patently offensive way sexual bestiality, sadism, masochism, necrophilia, or incest, and which taken as a whole, lack serious literary, artistic, political, or scientific value."  (*Id.* § II.)

Dubarry alleges that on April 11, 2020 and April 13, 2020, Alexis Leidiger attempted to send Dubarry videograms and photographs on his tablet device, and on December 7, 20[1]9, February 2, 2020, March 24, 2020, March 26, 2020, April 13, 2020, and April 24, 2020, Nicole Dubarry attempted to send Dubarry videograms and photographs on his tablet device, but that all videograms and photographs were rejected by John Doe Reviewing Officer #1 without any notification to Dubarry.  (*See* Compl. 6–7.)  Rivera alleges that on April 28, 2020 and May 8, 2021, Amaury Rubirosa attempted to send Rivera videograms and photographs on his tablet device; on June 1, 2020, Jennifer Thomas and Tamara Adams attempted to send Rivera videograms and photographs on his tablet device; on February 22, 2021 and April 30, 2021, Harry Rivera, Jr. attempted to send Rivera videograms and photographs on his tablet device; and on April 6, 2021, Jennifer Suzette Montero attempted to send Rivera videograms and photographs on his tablet device, but that all videograms and photographs were rejected by John Doe Reviewing Officer #2 without any notification to Rivera.  (*See id.* at 8.)  Finally, Griffin alleges that on February 6, 2020, February 8, 2020, March 28, 2020, April 1, 2020, April 7,

2020, and March 27, 2021, Nashara Grady attempted to send Rivera videograms and photographs, but that all videograms and photographs were rejected by John Doe Reviewing Officer #3 without any notification to Griffin.  (*See id.* at 9.)

On April 18, 2020, Griffin filed a grievance concerning the denial of the videograms and photographs, and on April 20, 2020, Dubarry and Rivera filed similar grievances; the three grievances were consolidated thereafter.  (*See* Compl. 7, 8, 10.)  On June 25, 2020, a hearing was held on the consolidated grievance, (*see id.*), and July 8, 2020, the grievance was denied by Malin, who explained that the videograms and photographs were denied "in accordance with departmental directives"; specifically, Malin explained that, as stated in prior CORC dispositions, "the possession of nude photographs presents a clear threat to the safety, security, and good order of the correctional facility" and that "nudity from the NYS Penal Law is 'the showing of the human male or female genitals, pubic area[,] or buttocks with less than a full opaque covering,'" (DOCCS Defs.' Mem. Ex. B).  Plaintiffs appealed Malin's decision to CORC, (*see* Compl. 7, 9, 10), which denied the appeal on October 1, 2020, (*see* DOCCS Defs.' Mem. Ex. C).  CORC explained that "monitoring of tablet content is a necessary function to ensure the safety and security of DOCCS correctional facilities" and that "the possession of nude photographs presents a clear threat to the safety, security[,] and good order of the correctional facility due to the difficulty in distinguishing between professionally posed, commercial produced[,] and personal ones."  (*Id.*)  CORC also explained that DOCCS "uses the definition of 'nudity' from the NYS Penal Law, which is the showing of the human male or female genitals, pubic area[,] or buttocks with less than a full opaque covering, of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state."  (*Id.*)

8

On June 2, 2020, while Plaintiffs' grievance process was pending, Rivera alleges that he wrote a letter to Annucci in which Rivera expressed his belief that Sing Sing was improperly denying photographs and videograms that contained nudity or pornography because DOCCS Directive No. 4572 "permits nudity/pornography" so long as the material does not contain child pornography or is otherwise "patently offensive" in the manner described in the directive.  (Stmt. of Undisputed Facts ¶ 11.)  McKoy responded on Annucci's behalf on August 24, 2020, explaining DOCCS's position on nude photographs and making clear that "[p]ersonal photographs are not published material and [are] not under the purview of [DOCCS Directive No. 4572]."  (Stmt. of Undisputed Facts Ex. F.)  Rivera responded to McKoy's letter on August 29, 2020, to which McKoy responded on October 29, 2020, reiterating his explanations in his August 24 letter.  (*See* Stmt. of Undisputed Facts Exs. G, H.)

Finally, Plaintiffs allege that in April 2021, Capra and Malin were present during an Inmate Liaison Committee meeting in which DOCCS's policy of denying nude photographs and videograms was discussed.  (*See* Stmt. of Undisputed Facts ¶ 15.)  As part of this discussion, Capra allegedly expressed that his position on the issue was the same as Malin's and CORC's, and that the issue was closed for further discussion.  (*See id.* ¶ 16.)

C.  Procedural History

Plaintiffs' initial Complaint was docketed on June 22, 2021, bringing claims against Defendants in addition to DOCCS.  (*See* Compl.)  On July 15, 2021, Plaintiffs' request to proceed in forma pauperis ("IFP") was granted, (*see* Dkt. Nos. 9, 10), and on August 13, 2021, the Court entered an Order of Service, (*see* Dkt. No. 13).  In the Order of Service, the Court dismissed Plaintiff's claims against DOCCS and against DOCCS Defendants in their official capacities on Eleventh Amendment grounds, ordered service on the named defendants by the

9

U.S. Marshals Service, and directed Plaintiffs to provide the Court with more detailed information as to the John Doe defendants to allow the Court to enter a *Valentin* order.  (*See id.*)

On November 12, 2021 and November 15, 2021, respectively, JPay and DOCCS Defendants each filed pre-motion letters; JPay anticipated filing a motion to compel arbitration and DOCCS Defendants anticipated filing a motion to dismiss the Complaint.  (*See* Dkt. Nos. 37, 39.)  On November 16, 2021, the Court directed JPay and DOCCS Defendants to discuss the interplay between their proposed motions and submit a proposal to the Court as to the appropriate means of handling them, (*see* Dkt. No. 41), and on November 30, 2021, JPay and DOCCS Defendants filed a joint letter in which they proposed that both JPay and DOCCS Defendants be permitted to file Rule 12(b)(6) motions before JPay filed its motion to compel arbitration, (*see* Dkt. No. 43).  JPay and DOCCS Defendants also proposed a briefing schedule.  (*See id.*)  On December 1, 2021, the Court adopted JPay and DOCCS Defendants' proposals as to both the ordering of the motions and the briefing schedule.  (*See* Dkt. No. 44.)

On January 28, 2022, JPay and DOCCS Defendants filed their respective motions.  (*See* JPay's Not. of Mot.; JPay's Mem. of Law in Supp. of Mot. ("JPay's Mem.") (Dkt. No. 54); DOCCS Defs.' Not. of Mot.; DOCCS Defs.' Mem.)  After seeking and receiving an extension of time, (*see* Dkt. Nos. 55, 56), Plaintiffs filed their Opposition to both Motions on March 29, 2022, alongside a "Statement of Undisputed Material Facts," (*see* Pls.' Mem.; Stmt. of Undisputed Material Facts).  After jointly seeking and receiving an extension of time, (*see* Dkt. Nos. 60, 61), JPay and DOCCS Defendants filed their Replies on April 13, 2022, (*see* JPay's Reply Mem. of Law in Supp. of Mot. ("JPay's Reply Mem.") (Dkt. No. 65); DOCCS Defs.' Reply Mem. of Law in Supp. of Mot. ("DOCCS Defs.' Reply Mem.") (Dkt. No. 63)).  After seeking and receiving an additional extension of time, (*see* Dkt. Nos. 67, 68), Plaintiffs filed their Sur-Reply on May 23,

2022.  (*See* Pls.' Sur-Reply Mem. of Law in Opp'n to Mots. ("Pls.' Sur-Reply Mem.") (Dkt. No. 70).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting FED. R. CIV. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading

11

regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Div. 1181*, 9 F.4th at 94 (citation omitted). Additionally, "when ruling on [a] Rule 12(b)(6) motion[] to dismiss," district courts are directed to confine their consideration to "the complaint in its entirety, . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin*, 6 F.4th at 473 (quotation marks omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same). However, when a plaintiff proceeds pro se, the Court "may consider materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), and, moreover, must "construe[] [his] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]," *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quotation marks omitted). That said, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

B. Analysis

Plaintiffs allege that by the conduct laid out above, Defendants: (1) violated Plaintiffs' First Amendment right to freedom of speech, (*see* Compl. 11); (2) additionally violated

Plaintiffs' "First Amendment" rights because DOCCS Directive Nos. 4425 and 4572 are unconstitutionally vague, (*see id.* at 11–12); and (3) violated Plaintiffs' Fourteenth Amendment right to equal protection, (*see id.* at 11).  Plaintiffs seek both damages and injunctive relief.  (*See id.* at 2–3, 12.)

Both DOCCS Defendants and JPay argue that the Complaint must be dismissed in its entirety, and certain of their arguments overlap.  DOCCS Defendants and JPay both argue that: (1) Plaintiffs have failed to state a cognizable First Amendment violation, because the Second Circuit has held that the denial of nude photographs and videograms does not violate an inmate's free speech rights, (*see* DOCCS Defs.' Mem. 6–8; JPay's Mem. 9–12); (2) Plaintiffs have failed to state a cognizable equal protection claim because Plaintiffs have failed to allege that they were in any way treated differently from similarly situated incarcerated individuals, (*see* DOCCS Defs.' Mem. 9–10; JPay's Mem. 12–14); and (3) Plaintiffs have failed to adequately allege that the policies at issue are unconstitutionally vague, (*see* DOCCS Defs.' Mem. 8–9; JPay's Mem. 14–16).  DOCCS Defendants also argue that Plaintiffs' claims against them are subject to dismissal because Plaintiffs have failed to allege personal involvement and because DOCCS Defendants are entitled to qualified immunity.  (*See* DOCCS Defs.' Mem. 4–6, 10–11.)  And, JPay additionally argues that Plaintiffs' claims against it are subject to dismissal because Plaintiffs have failed to allege that JPay is a state actor or that JPay was personally involved in the alleged constitutional violations, and in the alternative because JPay is entitled to qualified immunity.  (*See* JPay's Mem. 5–8, 9, 16 n.5.)

The Court addresses these arguments to the extent necessary to decide the instant Motions.

### 1.  First Amendment Free Speech Claim

It is well-established that while "'lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights,' . . . a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objections of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (alteration omitted) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)).  "Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Id.*; *see also Giano v. Senkowski*, 54 F.3d 1050, 1052–53 (2d Cir. 1995) ("The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." (quoting *Jones v. N.C. Prisoners' Union*, 433 U.S. 119, 125 (1977))).  "In weighing these competing interests, both the Supreme Court and [the Second Circuit] have emphasized that deference should be accorded to decision-making in the corrections system because courts are 'ill equipped to deal with the increasingly urgent problems of prison administration and reform' and 'running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.'" *Reynolds v. Quiros*, 25 F.4th 72, 83 (2d Cir. 2022) (alterations omitted) (quoting *Turner v. Safley*, 482 U.S. 78, 84–85 (1987)).

In determining the reasonableness—and thus, constitutionality—of a regulation that impinges on inmates' First Amendment rights, courts are instructed to consider four factors, originally set forth by the Supreme Court in *Turner*:

> (1) whether there is a valid and rational connection between the prison regulation and the legitimate, neutral government rationale offered to justify it; (2) whether the prisoner has an alternative means of exercising the constitutional right; (3) the impact that accommodating the prisoner's constitutional right would have on corrections staff, other inmates, and the general allocation of prison resources; and (4) whether there are ready alternatives to the prison regulation such that the regulation would be an exaggerated response to prison concerns.

*Id.* (citing *Turner*, 482 U.S. at 89–90). Critically, the Second Circuit has on at least two occasions considered the question of whether prison regulations may prohibit inmates from possessing nude, semi-nude, or sexually explicit materials, and on both occasions the Second Circuit upheld the regulations under the *Turner* factors. *See Giano*, 54 F.3d 1050; *see also Reynolds*, 25 F.4th 72.

In *Giano*, the Second Circuit considered a policy in place at Clinton Correctional Facility (a DOCCS facility) "that allowed inmates to possess commercially produced erotic literature, e.g., Playboy Magazine, but prohibited possession of nude or semi-nude photographs of spouses or girlfriends." *Giano*, 54 F.3d at 1051–52. Pursuant to this policy, prison officials had confiscated two semi-nude photographs of the plaintiff's then-girlfriend, and in response, the plaintiff filed a grievance and later sued under § 1983, claiming that the policy, inter alia, violated his right to freedom of speech under the First Amendment. *Id.* at 1052. In denying the plaintiff's grievance appeal, CORC explained that:

> [T]he policy was designed to maintain prison security and decrease violence among inmates . . . . The possession of actual photographs of nude females, which may be either girlfriends or wives, could cause violent confrontations should they wind up the possession of the wrong inmate/or be circulated amongst the members of the population. Photographs of nudes present a clear threat to safety, security[,] and good order of the correctional facility. Consequently, due to the sensitive nature of nude photographs, they will not be permitted into the facility.

*Id.* at 1052. CORC defined "nudity" in reference to New York Penal Law as: "the showing of the human male or female genitals, public area[,] or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any

15

portion thereof below the nipple, or the depiction of covered male genitals in a discernibly turgid state." *Id.* at 1057.  The district court considered this explanation in light of the *Turner* factors and found that "the policy passed constitutional muster because it was rationally related to legitimate penological interests," and granted summary judgment in the defendants' favor.  *Id.* at 1052.

On appeal, the Second Circuit agreed.  *See id.* at 1052–56.  As to the first *Turner* factor, the *Giano* court found that "the prison officials' purpose in promulgating the regulation—maintaining prison security and protecting against increased inmate violence—is obviously legitimate," crediting the government's proffered explanations that "an inmate who knows a fellow inmate or guard has seen the photographs without permission may become violent" and "insults—intended or perceived—from inmates who see the photographs (even with permission) may lead to violence."  *Id.* at 1054–55.  As to the second *Turner* factor, the *Giano* court found that "'other avenues' remain available for the exercise of the asserted right," citing "commercially produced erotica and sexually graphic written notes from wives or girlfriends [as] adequate substitutes for semi-nude personal photographs."  *Id.* at 1056.  Turning to the third *Turner* factor, the *Giano* court found that "if [the plaintiff's] claim is accorded full constitutional protection, it will, perforce, have an adverse impact on guards, other inmates[,] and prison resources," because "[i]ncreased violence among inmates has a direct adverse impact on the inmates involved, and a ripple effect on other inmates, prison staff[,] and prison resources."  *Id.* Finally, as to the fourth *Turner* factor, the *Giano* court found that "obvious, easy alternatives to the policy do not exist," noting that the plaintiff's suggestion of "allowing possession, but prohibiting inmates from displaying the personal photos in their cell and from distributing them to other prisoners . . . cavalierly disregards the informed judgment of prison officials regarding

16

the ease with which such photos could fall into other inmates' hands and lead to violence." *Id.* The Second Circuit therefore found that Clinton Correctional Facility's policy of prohibiting nude or semi-nude photographs of spouses or girlfriends did not violate the plaintiff's free speech rights, joining a series of other circuit courts which had by that point upheld very similar policies. *See id.* at 1053–54.

In *Reynolds*, the Second Circuit considered a Connecticut Department of Corrections ("DOC") policy that limited inmate access to sexually explicit materials, including but not limited to "pictorial depictions of nudity," defined as "the visual depiction or display of genitalia, public region, anus[,] or female breast where the areola is visible and not completely and opaquely covered." *Reynolds*, 25 F.4th at 80–81. DOC had instituted this policy in 2012, before which "sexually explicit materials, especially pictorial depictions of nudity and sexual acts, were ubiquitous in DOC facilities" and had "contributed to a very threatening environment for staff." *Id.* at 79 (quotation marks omitted). DOC therefore found that the policy—known as A.D. 10.7—"was necessary, from a practical standpoint, to achieve DOC's objectives of (1) enhancing the safety, security, and order of prison facilities, (2) supporting the rehabilitation of the inmate population, and (3) reducing the exposure of DOC staff to displays of sexually explicit materials in the workplace, thereby seeking to avoid a hostile work environment, particularly for staff." *Id.* at 80 (alterations and quotation marks omitted). A group of seven plaintiffs challenged the constitutionality of the policy under the First Amendment and after holding a bench trial, the district court concluded that A.D. 10.7 did not violate the plaintiffs' rights under the First Amendment after consideration of the *Turner* factors. *See id.* at 82.

On appeal, the Second Circuit agreed. *See id.* at 82–95. As to the first *Turner* factor, the *Reynolds* court found that "A.D. 10.7 is rationally related to several penological interests[:]

17

promoting a non-hostile work environment for corrections staff, enhancing the safety and security of DOC facilities, and facilitating the rehabilitation of sex offenders in DOC facilities." *Id.* at 85.  As to the second *Turner* factor, the *Reynolds* court cited *Giano* in finding that "although a sexually-suggestive television show or a sexually-explicit novel may be an imperfect substitute for *Playboy*, . . . the alternatives available in DOC facilities for the receipt of sexually explicit communications, as well as pictorial materials with sexual content that . . . are outside the definition of 'sexually explicit' are sufficient for us to conclude that 'other avenues remain available for the exercise of the asserted right.'" *Id.* at 92–93 (quoting *Giano*, 54 F.3d at 1056). Turning to the third *Turner* factor, the *Reynolds* court found that the evidence adduced at the bench trial had demonstrated that "a ripple effect on staff and inmates from the assertion of [the right at issue] had already been experienced and documented for many years within DOC facilities prior to the implementation of A.D. 10.7." *Id.* at 93.  Finally, as to the fourth *Turner* factor, the *Reynolds* court found that there were no obvious, easy alternatives to the policy, crediting the district court's holding that "the fact that numerous other correctional systems employ similar bans on sexually explicit publications is further evidence that there are no obvious, easy alternatives to the 2012 ban at issue here." *Id.* at 94.  Therefore, the Second Circuit in *Reynolds* again found that a policy of prohibiting, inter alia, nude or semi-nude photographs did not violate the plaintiffs' free speech rights, joining even more circuit courts which have now upheld very similar policies.  *See id.* at 84 (citing, inter alia, *Jones v. Salt Lake County*, 503 F.3d 1147 (10th Cir. 2007); *Mauro v. Arpaio*, 188 F.3d 1054 (9th Cir. 1999) (en banc); *Waterman v. Farmer*, 183 F.3d 208 (3d Cir. 1999); *Amatel v. Reno*, 156 F.3d 192 (D.C. Cir. 1998); *Fauconier v. Clarke*, 709 F. App'x 174 (4th Cir. 2018) (per curiam); *Josselyn v. Dennehy*, 333 F. App'x 581 (1st Cir. 2009) (per curiam)).

Both DOCCS Defendants and JPay argue that *Giano* and *Reynolds* squarely foreclose Plaintiff's First Amendment free speech claim here, and the Court agrees.  The policy at issue here is a DOCCS policy which prohibits the possession of photographs and videograms containing nudity, defined as "the showing of the human male or female genitals, pubic area[,] or buttocks with less than a full opaque covering, of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state," on the grounds that "the possession of nude photographs presents a clear threat to the safety, security[,] and good order of the correctional facility." (DOCCS Defs.' Mem. Ex. C.)  Plaintiffs argue that this policy violates their free speech rights as protected under the First Amendment, but the Second Circuit squarely held in *Giano* that an identical policy, designed with the same considerations in mind, does not constitute a violation of inmates' First Amendment free speech rights.  *See Giano*, 54 F.3d at 1051–56, 1057.  Moreover, the Second Circuit held earlier this year that a materially similar policy, designed with many of the same considerations in mind, does not constitute a violation of inmates' First Amendment free speech rights.  *See Reynolds*, 25 F.4th at 80–95.  Therefore, Plaintiffs cannot state a cognizable claim for violation of their First Amendment free speech rights via the application of this policy to the photographs and videograms that they attempted to receive.  *Cf. White v. Vance*, No. 10-CV-6142, 2011 WL 2565476, at *5 (S.D.N.Y. June 21, 2011) (dismissing claim that "prison officials 'regularly and unjustifiably' interfered with [the plaintiff's] personal mail" in confiscating "40 semi-nude photographs," explaining that "a correctional facility may authorize the confiscation of nude or semi-nude photographs of the spouses or girlfriends of inmates" (citing *Giano*, 54 F.3d at 1053–56)).

19

Neither of Plaintiffs' attempts to distinguish these authorities is persuasive. Plaintiffs attempt to distinguish *Giano* on the grounds that the photographs and videograms at issue here were sent via secure communications on password-protected tablet devices and therefore "no longer present a security concern because no-one can access [the] plaintiff's password protected tablet of its contents," (Pls.' Mem. 10; *see also* Pls.' Sur-Reply Mem. 3–4), but the Court fails to understand why this difference is material. In *Giano*, the Second Circuit specifically credited the government's proffered explanation that "insults—intended or perceived—from inmates who see the photographs (*even with permission*) may lead to violence," *Giano*, 54 F.3d at 1054–55 (emphasis added), and the Court sees is no reason why a password-protected photograph or videogram could not be voluntarily shared among inmates and potentially lead to the very violence that the DOCCS policy is designed to prevent. (*See* DOCCS Defs.' Mem. Ex. C (explaining that "the possession of nude photographs presents a clear threat to the safety, security[,] and good order of the correctional facility").) Plaintiffs attempt to distinguish *Reynolds* on the grounds that *Reynolds* examined a Connecticut DOC policy that banned "all sexually explicit pictorial [material]," presumably arguing that because the *Reynolds* court examined a different policy, its reasoning is inapposite. (Pls.' Sur-Reply Mem. 3.) While Plaintiffs are, of course, correct that the *Reynolds* court did not examine the policy at issue here, the Court finds that *Reynolds* is still highly persuasive authority given the similarities between the at-issue policies, and counsels in favor of granting the Motions as to Plaintiffs' free speech claim here.

Accordingly, Plaintiffs' First Amendment free speech claim is dismissed.

### 2. Fourteenth Amendment Equal Protection Claim

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see*

*also Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (same).  "[T]o assert an equal protection claim, a plaintiff must plead (1) adverse treatment 'compared with similarly situated individuals,' and (2) 'that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"  *Marom v. Town of Greenburgh*, No. 13-CV-4733, 2015 WL 783378, at *9 (S.D.N.Y. Feb. 23, 2015) (quoting *Miner v. Clinton Cnty.*, 541 F.3d 464, 474 (2d Cir. 2008)); *see also Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (holding that a plaintiff must allege "that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination" (citation omitted)).  "If the plaintiff is not a member of a protected class, a 'class of one' equal protection claim requires that (1) he was treated differently from others similarly situated in all relevant respects, (2) the defendant had no rational basis for the different treatment, and (3) the different treatment resulted from a non-discretionary state action."  *Marom*, 2015 WL 783378, at *9 (citing *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 604 (2008)); *see also Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59–60 (2d Cir. 2010) ("Class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves. Accordingly, to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person would regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." (quotation marks and citation omitted)).

21

It is well settled that "prisoners either in the aggregate or specified by offense are not a suspect class," *Graziano v. Pataki*, 689 F.3d 110, 117 (2d Cir. 2012) (quotation marks omitted); *see also Benjamin v. Jacobson*, 172 F.3d 144, 165 (2d Cir. 1999) ("[P]risoners are not a suspect class."), and Plaintiffs have entirely failed to allege that they possess any other characteristic that led to any manner of differential treatment.  (*See generally* Compl.)  This is fatal to their equal protection claim.  *See, e.g.*, *Harris v. Nassau Cnty.*, No. 13-CV-4728, 2016 WL 3023265, at *5 (E.D.N.Y. May 24, 2016) (explaining, in pro se case, that "[t]o set forth factual allegations sufficient to state an equal protection claim, the plaintiff . . . cannot rely on conclusory allegations devoid of factual support"); *Dellutri v. Vill. of Elmsford*, 895 F. Supp. 2d 555, 572–73 (S.D.N.Y. 2012) (finding equal protection claim to be subject to dismissal where "[t]he totality of [the] [p]laintiff's allegations regarding his [e]qual [p]rotection claim is a conclusory assertion, without any detail, that [the] [d]efendant differed in its 'treatment to other similarly situated property owners'" (collecting cases)); *cf. Giano*, 54 F.3d at 1057 (finding, on summary judgment, that where "[the plaintiff] presents no evidence that the policy [against allowing nude photographs] discriminated against a particular class of inmates," and "[i]n fact, [the] policy was applied to all inmates," that "[the plaintiff's] equal protection claim fails").[3]

Accordingly, Plaintiffs' equal protection claim is dismissed.

---

[3] Critically, Plaintiffs do not appear to dispute this conclusion.  While Plaintiffs' Opposition brief is otherwise quite detailed, Plaintiffs' only response as to their equal protection claim is to lodge a request to "amend the complaint to delete the word 'equal protection' from the second cause of action and add the word due process."  (Pls.' Mem. 20–21 (bolding and underlining omitted)).

### 3. Void for Vagueness Claim[4]

"As the Supreme Court has explained, under the Due Process Clause, 'the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Reynolds*, 25 F.4th at 96 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). "Therefore, 'the challenger can prevail by showing that the statute either fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or authorizes or even encourages arbitrary and discriminatory enforcement.'" *Id.* (quoting *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018)); *see also Giano*, 54 F.3d at 1057 ("A statute is unconstitutionally vague if persons of common intelligence must necessarily guess at its meaning and differ as to its application, or if it fails to give a person of ordinary intelligence fair notice of conduct proscribed or required by the regulation, and encourages arbitrary and erratic behavior on the part of officials charged with enforcing the rule." (citations omitted) (first citing *Connally*, 269 U.S at 391, then citing *United States v. Harriss*, 347 U.S. 612, 617 (1954), and then citing *Papachristou v. City of Jacksonville*,

---

[4] Plaintiffs have ostensibly brought their void-for-vagueness challenge under the First Amendment, but a void-for-vagueness challenge is properly brought under the due process clause of the Fifth and Fourteenth Amendments. *See Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."); *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) ("It is well-established that the Fourteenth Amendment . . . ensures that the individual need not speculate as to the meaning of penal statutes and is entitled to be informed as to what the State commands or forbids. As one of the most fundamental protections of the Due Process Clause, the void-for-vagueness doctrine requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." (quotation marks and citations omitted)). Accordingly, the Court construes Plaintiffs' void-for-vagueness challenge as brought under the Fourteenth Amendment.

405 U.S. 156, 162 (1972))).  While the void-for-vagueness doctrine is most classically applicable

to criminal statutes, the Second Circuit in *Reynolds* made clear that a vagueness challenge can

stand against a prison regulation, even if violation of the regulation at issue does not carry

concomitant disciplinary consequences, though "[l]aws with civil consequences receive less

exacting vagueness scrutiny."  *Reynolds*, 25 F.4th at 95–96 (quotation marks omitted).

Here, Plaintiffs have broadly claimed that the DOCCS policies at issue "are

unconstitutionally vague because Directives #4572[] and #4425 don't factor in that the

videograms and photo[s] are stored on a secured password protected J[P]ay tablet, that no other

person has access to plaintiff's table[t], and there is no security [distinction] between nude

commercial material such as books[] and magazines which is allowed after the facilities media

review committee deems such material appropriate."  (Compl. 11–12.)  However, in making this

claim, Plaintiffs have not identified any specific language or provisions of any DOCCS policy

that "fails to provide people of ordinary intelligence a reasonable opportunity to understand what

conduct it prohibits or authorizes or even encourages arbitrary or discriminatory enforcement."

*Reynolds*, 25 F.4th at 96.  Moreover, the Second Circuit in *Giano* held that Clinton Correctional

Facility's policy, which, again, is identical to the policy at issue here, was not unconstitutionally

vague, foreclosing relief on this claim.  *See Giano*, 54 F.3d at 1057 (reciting CORC's definition

of "nudity" and holding that "[a] person of ordinary intelligence would understand this policy");

*see also Reynolds*, 25 F.4th at 96 ("Given the clear and specific definitions of both 'sexual

activity' and 'nudity,' there is no doubt that a person of ordinary intelligence would understand

which pictorial materials fell within these definitions.")

Accordingly, Plaintiffs' void-for-vagueness challenge is dismissed.[5]

  4. Other Issues

  Given the Court's conclusions that Plaintiffs have failed to state a claim for violation of their First Amendment free speech rights, violation of their Fourteenth Amendment equal protection rights, or violation of their Fourteenth Amendment due process rights, the Court need not address any of the Parties' other arguments to dismiss the Complaint in its entirety. However, the Court briefly remarks on certain of the Parties' other arguments, to the extent helpful in framing future pleadings and briefing.

  First, Plaintiffs argued in their Opposition brief that DOCCS Defendants and JPay's Motions should be denied because the Court conducted an initial screening of Plaintiffs' Complaint as required under the Prison Litigation Reform Act ("PLRA") and allowed some of Plaintiffs' claims to proceed.  (*See* Pls.' Mem. 4–6.)  However, "a court's decision allowing some claims to go forward at the initial screening does not insulate those claims from later review on a motion to dismiss." *Jordan v. Greater Buffalo United Accountable Healthcare Network*, No. 20-CV-67, 2021 WL 2419564, at *2 (W.D.N.Y. Apr. 20, 2021) (collecting cases); *see also Davis v. Lipish*, No. 17-CV-898, 2018 WL 5268122, at *3 (D. Conn. Oct. 23, 2018) (explaining that "[t]he [c]ourt's [i]nitial [r]eview [o]rder is a preliminary screening of the plaintiff's claims, and nothing in this ruling is intended to prevent defendants from moving to dismiss the amended complaint").  Therefore, Plaintiffs' argument that the Court should deny the Motions based on the fact that the Court allowed certain of Plaintiffs' claims to proceed at the initial screening stage is incorrect as a matter of law.

---

[5] The Court again notes that Plaintiffs do not appear to dispute this conclusion, having chosen not to reference their void-for-vagueness claim in either their detailed Opposition brief or Sur-Reply brief.  (*See generally* Pls.' Mem.; Pls.' Sur-Reply Mem.)

Second, JPay has argued that all of Plaintiffs' claims against it are subject to dismissal because Plaintiffs' claims are brought pursuant to § 1983 and JPay is not a state actor. (*See* JPay's Mem. 5–8.)  The Court agrees.  The Supreme Court has explained that "[t]o state a claim for relief in an action brought under § 1983, [the plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999).  "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" *Id.* (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)).  However, the state action requirement of § 1983 does not entirely absolve non-governmental entities from liability because under certain circumstances, conduct by a private entity can constitute state action.  "It is settled that conduct by a private entity constitutes state action . . . when 'there is a sufficiently close nexus between the State and the challenged conduct of the private entity so that the action of the latter may be fairly treated as that of the State itself.'" *Tancredi v. Metro. Life Ins. Co.*, 378 F.3d 220, 229 (2d Cir. 2004) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

Government contractors can be considered state actors for § 1983 purposes, but "[t]he fact that the state may contract with a private party to perform a function does not transform the private party into a state actor unless the function is traditionally exclusively a state function." *Phelan ex rel. Phelan v. Torres*, 843 F. Supp. 2d 259, 273 (E.D.N.Y. 2011) (citing *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 492 (2d Cir. 2009)).  It is for this reason that courts have found, for instance, that a private entity that contracts with a correctional facility to provide medical care is a state actor for § 1983 purposes, and a private entity that contracts with a correctional

26

facility to provide telephone services is not. *Compare Bess v. City of New York*, No. 11-CV-7604, 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013) (finding that a private entity "may be named as a defendant in a § 1983 suit" because "[i]n providing medical care in prisons, [the entity] performs a role traditionally within the exclusive prerogative of the state") *with Sims v. SecurusTech.net Connection*, No. 13-CV-5190, 2014 WL 1383084, at *5 & n.5 (E.D.N.Y. Apr. 8, 2014) (finding that the fact that a private entity that provides "call management and communication systems for use by correctional facilities" had a "public contract with the Suffolk Jail" did not "render [the entity] a 'state actor' . . . for purposes of [§] 1983"). In providing "media services" to DOCCS facilities, (Compl. 5), JPay is comparable to an entity providing telephone services, and is thus not a state actor for purposes of § 1983 liability. *See e.g., Stevens v. Cuomo*, No. 21-CV-306, 2021 WL 3165364, at *3 (N.D.N.Y. July 27, 2021) (finding that providing access to telephone and Wi-Fi services "are not functions that have been traditionally performed by governments[,]" and the fact that a private entity "was an exclusive provider . . . [with] some discretion" regarding service implementation does not "transform the private contract with DOCCS into a state actor agreement").

### III.  Conclusion

For the foregoing reasons, the Motions are granted. However, because this is the first adjudication of Plaintiffs' claims on the merits, the dismissal is without prejudice. If Plaintiffs wish to file an amended complaint, Plaintiffs should include within that amended complaint any changes to correct the deficiencies identified in this Opinion that Plaintiffs wish the Court to consider. The amended complaint will replace, not supplement, the original complaint. The amended complaint must therefore contain *all* of the claims and factual allegations Plaintiffs

wish the Court to consider.[6]  The Court will not consider factual allegations contained in

supplemental letters, declarations, or memoranda.  If Plaintiffs fail to abide by the 30-day

deadline, this Action may be dismissed with prejudice.

The Clerk of Court is directed to terminate the pending motions, (*see* Dkt. Nos. 51, 53), a

mail copies of this Opinion & Order to Plaintiffs at the addresses listed in the docket.

SO ORDERED.

Dated:    September 27, 2022
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge

---

[6] Should Plaintiffs choose to file an amended complaint, they may include their
contemplated Fourteenth Amendment due process claim and any corresponding factual
allegations that Plaintiffs would like the Court to consider.  (*See* Pls.' Mem. 20–21.)  However,
the Court cautions Plaintiffs that if Plaintiffs simply "delete the word 'equal protection' from the
second cause of action and add the word [sic] due process," (*id.*), it is highly unlikely that their
due process claim would succeed.  "To present a due process claim, a plaintiff must establish
(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest
as a result of insufficient process."  *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004)
(alteration omitted) (quoting *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001)).  The Second
Circuit has made clear that "[t]he Due Process Clause does not protect against 'every change in
the conditions of confinement having a substantial adverse impact' on inmates if those changes
are 'within the normal limits or range of custody which the conviction has authorized the State to
impose.'"  *Arce v. Walker*, 139 F.3d 329, 333 (2d Cir. 1998) (citation omitted) (quoting *Sandin v.
Conner*, 515 U.S. 472, 478 (1995)).  "Instead, the Due Process Clause protects against restraints
or conditions of confinement that 'exceed the sentence in an unexpected manner.'"  *Id.*
(alterations omitted) (quoting *Sandin*, 515 U.S. at 484).  By means of comparison, Special
Housing Unit ("SHU") confinement for fewer than *101 days* will not presumptively implicate an
inmate's liberty interest unless that confinement is accompanied by "atypical and significant
hardships."  *Palmer v. Richards*, 364 F.3d 60, 64–66 (2d Cir. 2004).

Accordingly, while the Court will reserve judgment on the merits of any due process
claim here until Plaintiffs amend their complaint (if they choose to do so) and Defendants have
an opportunity to weigh in on the merits of the claim, the Court is skeptical that Plaintiffs could
ever successfully state a due process claim based on the denial of nude photographs and videos.