UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DARIUS DUBARRY, HARRY RIVERA,
*and* JAYQUAN GRIFFIN, *on behalf of
themselves and all others similarly situated*,

                              Plaintiffs,

        v.

ANTHONY ANNUCCI, JEFF McKOY,
MICHAEL CAPRA, LESLIE MANN,
STEPHEN BRANDOW, JPAY INC., *and*
MEMBERS OF STATE OF NEW YORK
DEPT. OF CORRECTIONS &
COMMUNITY SUPERVISION,

                              Defendants.

No. 21-CV-5487 (KMK)

OPINION & ORDER

Appearances:

Darius Dubarry
Harry Rivera
Jayquan Griffin
Ossining, NY
*Pro se Plaintiffs*

Kathryn E. Martin, Esq.
Office of the New York Attorney General
White Plains, NY
*Counsel for Defendants Anthony Annucci, Jeff McKoy, Michael Capra, Leslie Malin, & Stephen
Brandow*

Colleen L. Smeryage, Esq.
Constantine P. Economides, Esq.
Devin Freedman, Esq.
Freedman Normand Friedland LLP
Miami, FL
*Counsel for Defendant JPay, Inc.*

KENNETH M. KARAS, United States District Judge:

Darius Dubarry ("Dubarry"), Harry Rivera ("Rivera"), and Jayquan Griffin ("Griffin"; together, "Plaintiffs"), proceeding pro se, bring this Action against Anthony Annucci ("Annucci"), Jeff McKoy ("McKoy"), Michael Capra ("Capra"), Leslie Malin ("Malin"), Stephen Brandow ("Brandow"; together with Annucci, McKoy, Capra, and Malin, "DOCCS Defendants"), JPay, Inc. ("JPay"), and Members of State of New York Department of Corrections and Community Supervision, (collectively, "Defendants"), pursuant to 42 U.S.C. § 1983, alleging that Defendants violated their rights under the First and Fourteenth Amendments by instituting and enforcing a department-wide policy of denying inmates nude photographs and videos on secure tablet devices. (*See generally* Am. Compl. ("FAC") (Dkt. No. 79).)[1]  Before the Court are DOCCS Defendants' Motion To Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("DOCCS Defendants' Motion") and JPay's Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("JPay's Motion"; together, the "Motions"). (*See* DOCCS Defs.' Not. of Mot. (Dkt. No. 84); JPay's Not. of Mot. (Dkt. No. 87).)  For the following reasons, the Motions are granted.

## I.  Background

### A.  Factual Background

The following facts are taken from Plaintiffs' Amended Complaint, (*see* FAC), and are assumed to be true for the purposes of ruling on the instant Motion. *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021)

---

[1] As of the date of this Opinion, "Members of State of New York Department of Corrections and Community Supervision" have not been served in this Action.  As such, the Court will not refer to this Defendant in the instant Opinion.

(per curiam).  Where relevant, the Court also recounts facts from the materials attached to Plaintiffs' Amended Complaint.[2]

Plaintiffs are currently—and at all times relevant to the instant Action have been—inmates of Sing Sing Correctional Facility ("Sing Sing"), located in Ossining, New York.  (*See* FAC 3, 4.)  DOCCS Defendants are each supervisory officials employed by DOCCS: Annucci is the Acting Commissioner of DOCCS, McKoy is the Deputy Commissioner of DOCCS, Brandow is the Deputy Commissioner of Administrative Services of DOCCS, Capra is the Superintendent of Sing Sing, and Malin is the Deputy Superintendent of Programs at Sing Sing.  (*See id.* at 3–5.)  JPay is a private entity that has contracted with DOCCS to provide media services to inmates confined in DOCCS facilities via tablet devices.  (*See id.* at 5.)

Plaintiffs allege that between December 2019 and April 2021, Plaintiffs were each sent a number of videograms and photographs from individuals outside of Sing Sing via their respective tablet devices, which were reviewed and rejected "by a John Doe defendant(s) without notification in violation of [DOCCS] Directive[s] [Nos.] #4572 and #4425."  (*See id.* at 6; *see*

---

[2] Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). "Nevertheless, the Court's consideration of documents attached to, or incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Id.*; *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety . . . , documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *Hu v. City of N.Y.*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken." (alteration omitted) (quoting *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993))).

Plaintiffs have attached sixteen exhibits to their Amended Complaint, which the Court will consider in ruling on the instant Motions.  (*See* FAC Ex. A–P (Dkt. No. 79).)

*also* FAC Ex. N, at 55–65 ("Directive 4425") (Dkt. No. 79); FAC Ex. O. at 66–74 ("Directive 4572") (Dkt. No. 79).)[3]  DOCCS Directive No. 4425 "contains and describes the policies and procedures governing the tablet program available to inmates in general population," which is designed for, inter alia, "the opportunity to use a secure messaging system to communicate with family and friends as approved by [DOCCS]."  (Directive 4425 at §§ I, II.)  As part of the program, DOCCS provides to each inmate a tablet device at no cost, which the inmate can connect to one of several kiosks located in common areas of DOCCS facilities to download a selection of materials, some of which have an associated cost, using his or her password-protected kiosk account.  (*See id.* §§ III, IV.A.)  Inmates are not permitted to share tablets, kiosk accounts, or passwords.  (*See id.* §§ IV.B., IV.E.)  Inmates using their tablets for secure messaging are required to comply with applicable DOCCS policies; further, all secure messages are subject to content screening by authorized staff, who may reject messages and associated attachments that violate DOCCS policies.  (*See id.* §§ IV.J., IV.K., IV.L.)  When a message is rejected, the sender of the message—whether he or she is an inmate or civilian—is notified of the rejection.  (*See id.* §§ IV.K., IV.L.)

DOCCS Directive No. 4572 sets forth DOCCS' policy "encourag[ing] incarcerated individuals to read publications from varies sources if such material does not encourage them to engage in behavior that might be disruptive to orderly facility operations."  (Directive 4572 at § I.)  As relevant to the instant dispute, DOCCS Directive No. 4572 prohibits publications "which contain child pornography"; which "depict[] nude children in a non-pornographic context but . . . could promote or encourage prurient interest in the sexual performance of children"; and

---

[3] A videogram is defined by DOCCS Directive No. 4425 as "[a] 30-second video clip recorded by a community member and sent to an inmate as a secure message."  (Directive 4425 at § III.K; *see also* FAC 10 (defining "videogram" pursuant to Directive #4425).)

"which, taken as a whole, by the average person applying contemporary standards, appeal to prurient interest, and which depict or describe in a patently offensive way sexual bestiality, sadism, masochism, necrophilia, or incest, and which taken as a whole, lack serious literary, artistic, political, or scientific value." (*Id.* § II.)  Moreover, the Directive states that publications "should not incite violence" and "[a]ny publication which advocates and presents a clear and immediate risk of lawlessness, violence, anarchy, or rebellion against Governmental authority is unacceptable." (*Id.*)  In addition to Directives Nos. #4572 and #4425, Plaintiffs alleges that, "[u]nder the contract . . ., JPay [] is allowed to make and implement policies concerning the provided secure nude videos and photographs on their J[P]ay secure tablets." (FAC 5.)

Dubarry alleges that on April 11, 2020 and April 13, 2020, Alexis Leidiger attempted to send Dubarry videograms and photographs on his tablet device, and on December 7, 2019, February 2, 2020, March 24, 2020, March 26, 2020, April 13, 2020, and April 24, 2020, Nicole Dubarry attempted to send Dubarry videograms and photographs on his tablet device, but that all videograms and photographs were rejected by a reviewing officer without any notification to Dubarry. (*See id.* 6.)  Rivera alleges that on April 28, 2020 and May 8, 2021, Amaury Rubirosa attempted to send Rivera videograms and photographs on his tablet device; on June 1, 2020, Jennifer Thomas and Tamara Adams attempted to send Rivera videograms and photographs on his tablet device; on February 22, 2021 and April 30, 2021, Harry Rivera, Jr. attempted to send Rivera videograms and photographs on his tablet device; and on April 6, 2021, Suzette Montero attempted to send Rivera videograms and photographs on his tablet device, but that all videograms and photographs were rejected by a reviewing officer without any notification to Rivera. (*See id.*)  Finally, Griffin alleges that on February 6, 2020, February 8, 2020, March 27, 2020, April 1, 2020, and April 7, 2020, Nashara Grady attempted to send Rivera videograms and

photographs, but that all videograms and photographs were rejected by a reviewing officer without any notification to Griffin.  (*See id.*)

On April 18, 2020, Griffin filed a grievance concerning the denial of the videograms and photographs, and on April 20, 2020, Dubarry and Rivera filed similar grievances; the three grievances were consolidated thereafter.  (*See* FAC Ex. B, at 22–25.)  On June 25, 2020, a hearing was held on the consolidated grievance, (*see* FAC 7), and July 8, 2020, the grievance was denied by Malin, who explained that the videograms and photographs were denied "in accordance with departmental directives"; specifically, Malin explained that, as stated in prior Central Officer Review Committee ("CORC") dispositions, "the possession of nude photographs presents a clear threat to the safety, security, and good order of the correctional facility" and that "nudity from the NYS Penal Law is 'the showing of the human male or female genitals, pubic area[,] or buttocks with less than a full opaque covering,'" (FAC Ex. C, at 27).  Plaintiffs appealed Malin's decision to CORC, (*see* FAC 7; FAC Ex. D, at 29–30), which denied the appeal on October 1, 2020, (*see* FAC Ex. E, at 32).  CORC explained that "monitoring of tablet content is a necessary function to ensure the safety and security of DOCCS correctional facilities" and that "the possession of nude photographs presents a clear threat to the safety, security[,] and good order of the correctional facility due to the difficulty in distinguishing between professionally posed, commercial produced[,] and personal ones."  (*Id.*)  CORC also explained that DOCCS "uses the definition of 'nudity' from the NYS Penal Law, which is the showing of the human male or female genitals, pubic area[,] or buttocks with less than a full opaque covering, of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state."  (*Id.*)

On June 2, 2020, while Plaintiffs' grievance process was pending, Rivera alleges that he wrote a letter to Annucci in which Rivera expressed his belief that Sing Sing was improperly denying photographs and videograms that contained nudity or pornography because DOCCS Directive No. 4572 "permits nudity/pornography" so long as the material does not contain child pornography or is otherwise "patently offensive" in the manner described in the directive.  (*See* FAC 7–8; FAC Ex. F, at 34–35.)  In this letter, Rivera stated that he "encountered an officer from the Office of Special Investigations . . . on June 2, 2020" who "informed [Rivera] that 'pursuant to the directive, [Rivera] is suppose[d] to receive all available content consistent with Departmental Directive 4572[.]"  (FAC Ex. F, at 34; *see also* FAC 7 (stating that the officer "informed [Rivera] that such photos and videos where [sic] acceptable").)  McKoy responded on Annucci's behalf on August 24, 2020, explaining DOCCS's position on nude photographs and making clear that "[p]ersonal photographs are not published material and [are] not under the purview of [DOCCS Directive No. 4572]."  (FAC Ex. G, at 37; *see also* FAC 8.)  Rivera responded to McKoy's letter on August 29, 2020 with further justification, (*see* FAC Ex. H, at 39; FAC 8), to which McKoy responded on October 29, 2020, reiterating his explanations in his August 24 letter, (*see* FAC Ex. I, at 41; FAC 8).

Plaintiffs allege that on July 7, 2020, Dubarry wrote to JPay and requested the "terms regarding pictures and videograms that are sent from family."  (FAC 9.)  Plaintiffs allege that JPay's Arbitration Unit stated that his letter would be forwarded to JPay's legal department, however, Dubarry never received a response.  (*Id*.)  In July 2020, Dubarry also alleges that he submitted a "F.O.I.L. Request" requesting the names of the reviewing officers who denied his photos and videograms, but this information was never provided to Dubarry.  (*Id*.)

Finally, Plaintiffs allege that in April 2021, Capra and Malin were present during an Inmate Liaison Committee ("ILC") meeting in which DOCCS's policy of denying nude photographs and videograms was discussed.  (*See* FAC 8–9; FAC Ex. J, at 43–48.)  As outlined in the Committee meeting notes, "[m]embers of the population have expressed that some permissible pictures and video[s] are improperly denied[,]" citing "some confusion regarding what constituted allowable media when the content in question often is in compliance with Directive # 4572 [and] 4422."  (FAC Ex. J, at 45.)  As part of this discussion, Plaintiffs allege that Capra expressed that his position on the issue was the same as Malin's and CORC's, and that Capra "gave all the lieutenants specific instructions to deny all photos and videograms that were not PG-13" and that "anyone that wanted photos that [are] allow[ed] by the Media Review and Correspondence Directives should receive such by mail."  (FAC 9.)  Plaintiffs also allege that "[t]he denial was to include videograms where people were fully clothed by dancing in what [Capra] felt was a sexually suggestive manner, specifically no 'twerking.'"  (*Id*.)  As per the Committee meeting notes, Capra allegedly "reminded ILC that [it is] the responsibility of the sender to know what is allowed and what is not."  (FAC Ex. J, at 46.)

B.  Procedural History

Plaintiffs' initial Complaint was docketed on June 22, 2021, bringing claims against Defendants in addition to DOCCS.  (*See* Compl.)  On July 15, 2021, Plaintiffs' request to proceed in forma pauperis ("IFP") was granted, (*see* Dkt. Nos. 9, 10), and on August 13, 2021, the Court entered an Order of Service, (*see* Dkt. No. 13).  In the Order of Service, the Court dismissed Plaintiff's claims against DOCCS and against DOCCS Defendants in their official capacities on Eleventh Amendment grounds, ordered service on the named defendants by the U.S. Marshals Service, and directed Plaintiffs to provide the Court with more detailed information as to the John Doe defendants to allow the Court to enter a *Valentin* order.  (*See id.*)

On November 12, 2021 and November 15, 2021, respectively, JPay and DOCCS Defendants each filed pre-motion letters; JPay anticipated filing a motion to compel arbitration and DOCCS Defendants anticipated filing a motion to dismiss the Complaint.  (*See* Dkt. Nos. 37, 39.)  On November 16, 2021, the Court directed JPay and DOCCS Defendants to discuss the interplay between their proposed motions and submit a proposal to the Court as to the appropriate means of handling them, (*see* Dkt. No. 41), and on November 30, 2021, JPay and DOCCS Defendants filed a joint letter in which they proposed that both JPay and DOCCS Defendants be permitted to file Rule 12(b)(6) motions before JPay filed its motion to compel arbitration, (*see* Dkt. No. 43).  JPay and DOCCS Defendants also proposed a briefing schedule.  (*See id.*)  On December 1, 2021, the Court adopted JPay and DOCCS Defendants' proposals as to both the ordering of the motions and the briefing schedule.  (*See* Dkt. No. 44.)

On January 28, 2022, JPay and DOCCS Defendants filed their respective motions.  (*See* JPay's Not. of Mot. (Dkt. No. 53); JPay's Mem. of Law in Supp. of Mot. (Dkt. No. 54); DOCCS Defs.' Not. of Mot. (Dkt. No. 51); DOCCS Defs.' Mem. of Law in Supp. of Mot. (Dkt. No. 52).)  After seeking and receiving an extension of time, (*see* Dkt. Nos. 55, 56), Plaintiffs filed their Opposition to both Motions on March 29, 2022, alongside a "Statement of Undisputed Material Facts," (*see* Pls.' Mem. of Law in Opp'n to Mots. (Dkt. No. 58); Stmt. of Undisputed Material Facts (Dkt. No. 59)).  After jointly seeking and receiving an extension of time, (*see* Dkt. Nos. 60, 61), JPay and DOCCS Defendants filed their Replies on April 13, 2022, (*see* JPay's Reply Mem. of Law in Supp. of Mot. (Dkt. No. 65); DOCCS Defs.' Reply Mem. of Law in Supp. of Mot. (Dkt. No. 63)).  After seeking and receiving an additional extension of time, (*see* Dkt. Nos. 67, 68), Plaintiffs filed their Sur-Reply on May 23, 2022.  (*See* Pls.' Sur-Reply Mem. of Law in Opp'n to Mots. (Dkt. No. 70).)  On September 27, 2022, the Court granted the DOCCS'

Defendants and JPay's Motions, and gave Plaintiffs 30 days to amend the complaint to address any deficiencies identified in the Opinion.  (Op. & Order ("Op.") (Dkt. No. 71).)

On November 21, 2022, the Court issued an Order to Show Cause as to why the case should not be dismissed, given that Plaintiffs had not yet filed an amended complaint.  (*See* Dkt. No. 72.)  Given the lack of response from Plaintiffs, the Court dismissed the case without prejudice on December 22, 2022.  (Dkt. No. 77.)  On January 5, 2023, the Court received a letter from Plaintiffs dated January 1, 2023, requesting that the case be reopened and attaching an amended complaint.  (*See* Dkt. No. 78; FAC.)  The DOCCS Defendants' and JPay separately filed letter requesting an extension of time to file a pre-motion letter for leave to file a motion to dismiss, and requested that the Court keep this action closed.  (Dkt. Nos. 80, 82.)  On January 19, 2023, the Court reopened the case and set a briefing schedule in lieu of a pre-motion conference. (Dkt. No. 83.)

On February 17, 2023, JPay and DOCCS Defendants filed their respective motions.  (*See* DOCCS Defs.' Not. of Mot.; DOCCS' Defs.' Mem. of Law in Supp. of Mot. ("DOCCS Mem.") (Dkt. No. 85); JPay's Not. of Mot.; JPay Mem. of Law in Supp. of Mot. ("JPay Mem.") (Dkt. No. 88).)  On March 16, 2023, Plaintiffs filed their Opposition to both Motions.  (*See* Pl's Mem. in Opp. to Mots. ("Pl's Mem.") (Dkt. No. 89).)  JPay and DOCCS Defendants filed their Replies on March 24, 2023.  (*See* DOCCS Defs.' Reply Mem. of Law in Supp. of Mot. ("DOCCS Reply Mem.") (Dkt. No. 90); JPay's Reply Mem. of Law in Supp. of Mot. ("JPay Reply Mem.") (Dkt. No. 92).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

   "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Div. 1181*, 9 F.4th at 94

(citation omitted).  Additionally, "when ruling on [a] Rule 12(b)(6) motion[] to dismiss," district courts are directed to confine their consideration to "the complaint in its entirety, . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin*, 6 F.4th at 473 (quotation marks omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).  However, when a plaintiff proceeds pro se, the Court "may consider materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), and, moreover, must "construe[] [his] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]," *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quotation marks omitted).  That said, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law."  *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga Cnty.*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

    B.  Analysis

Plaintiffs allege that by the conduct laid out above, Defendants: (1) violated Plaintiffs' First Amendment right to freedom of speech, (*see* FAC 12); (2) violated Plaintiffs' Fourteenth Amendment right to equal protection and due process, (*see id.*); and (3) violated Plaintiffs' "First Amendment" rights because DOCCS Directive Nos. 4425 and 4572 are unconstitutionally vague and deny due process, (*see id.*).  Plaintiffs seek both damages and injunctive relief.  (*See id.* at 2–3, 13.)

Both DOCCS Defendants and JPay argue that the Complaint must be dismissed in its entirety, and certain of their arguments overlap. DOCCS Defendants and JPay both primarily argue that Plaintiffs failed to plead any additional facts to cure the deficiencies identified in this Courts previous Opinion and Order. (*See* DOCCS Mem. 4–6; JPay Mem. 1–2, 10–11, 14–15.) Both DOCCS Defendant and JPay also argue that Plaintiffs have failed to state a Fourteenth Amendement due process claim, which Plaintiffs added in their Amended Complaint. (*See* DOCCS Mem. 6–8; JPay Mem. 12–14.) In addition, DOCCS Defendants argue that Plaintiffs' claims against them are subject to dismissal because Plaintiffs have failed to allege personal involvement and because DOCCS Defendants are entitled to qualified immunity. (*See* DOCCS Mem. 8–13.) And, JPay additionally argues that Plaintiffs' claims against it are subject to dismissal because Plaintiffs have failed to allege that JPay is a state actor or that JPay was personally involved in the alleged constitutional violations. (*See* JPay's Mem. 6–9.)

The Court addresses these arguments to the extent necessary to decide the instant Motions.

### 1. First Amendment Free Speech Claim

It is well-established that while "'lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights,' . . . a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objections of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (alteration omitted) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)). "Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Id.*; *see also Giano v. Senkowski*, 54 F.3d 1050, 1052–53 (2d Cir. 1995) ("The fact of confinement and the needs of the

penal institution impose limitations on constitutional rights, including those derived from the

First Amendment, which are implicit in incarceration." (quoting *Jones v. N.C. Prisoners' Union*,

433 U.S. 119, 125 (1977))).  "In weighing these competing interests, both the Supreme Court and

[the Second Circuit] have emphasized that deference should be accorded to decision-making in

the corrections system because courts are 'ill equipped to deal with the increasingly urgent

problems of prison administration and reform' and 'running a prison is an inordinately difficult

undertaking that requires expertise, planning, and the commitment of resources, all of which are

peculiarly within the province of the legislative and executive branches of government.'"

*Reynolds v. Quiros*, 25 F.4th 72, 83 (2d Cir. 2022) (alterations omitted) (quoting *Turner v.*

*Safley*, 482 U.S. 78, 84–85 (1987)).

     In determining the reasonableness—and thus, constitutionality—of a regulation that

impinges on inmates' First Amendment rights, courts are instructed to consider four factors,

originally set forth by the Supreme Court in *Turner*:

> (1) whether there is a valid and rational connection between the prison regulation
> and the legitimate, neutral government rationale offered to justify it; (2) whether
> the prisoner has an alternative means of exercising the constitutional right; (3) the
> impact that accommodating the prisoner's constitutional right would have on
> corrections staff, other inmates, and the general allocation of prison resources; and
> (4) whether there are ready alternatives to the prison regulation such that the
> regulation would be an exaggerated response to prison concerns.

*Id.* (citing *Turner*, 482 U.S. at 89–90).

     As stated in this Court's first Opinion, (*see* Op. at 15), critically, the Second Circuit has

on at least two occasions considered the question of whether prison regulations may prohibit

inmates from possessing nude, semi-nude, or sexually explicit materials, and on both occasions

the Second Circuit upheld the regulations under the *Turner* factors.  *See Reynolds*, 25 F.4th 72;

*Giano*, 54 F.3d 1050.

In *Giano*, the Second Circuit considered a policy in place at Clinton Correctional Facility (a DOCCS facility) "that allowed inmates to possess commercially produced erotic literature, e.g., Playboy Magazine, but prohibited possession of nude or semi-nude photographs of spouses or girlfriends." *Giano*, 54 F.3d at 1051–52.  Pursuant to this policy, prison officials had confiscated two semi-nude photographs of the plaintiff's then-girlfriend, and in response, the plaintiff filed a grievance and later sued under § 1983, claiming that the policy, inter alia, violated his right to freedom of speech under the First Amendment.  *Id.* at 1052.  In denying the plaintiff's grievance appeal, CORC explained that:

> [T]he policy was designed to maintain prison security and decrease violence among inmates . . . . The possession of actual photographs of nude females, which may be either girlfriends or wives, could cause violent confrontations should they wind up the possession of the wrong inmate/or be circulated amongst the members of the population.  Photographs of nudes present a clear threat to safety, security[,] and good order of the correctional facility.  Consequently, due to the sensitive nature of nude photographs, they will not be permitted into the facility.

*Id.* at 1052.  CORC defined "nudity" in reference to New York Penal Law as: "the showing of the human male or female genitals, public area[,] or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the nipple, or the depiction of covered male genitals in a discernibly turgid state." *Id.* at 1057.  The district court considered this explanation in light of the *Turner* factors and found that "the policy passed constitutional muster because it was rationally related to legitimate penological interests," and granted summary judgment in the defendants' favor.  *Id.* at 1052.

On appeal, the Second Circuit agreed.  *See id.* at 1052–56.  As to the first *Turner* factor, the *Giano* court found that "the prison officials' purpose in promulgating the regulation— maintaining prison security and protecting against increased inmate violence—is obviously legitimate," crediting the government's proffered explanations that "an inmate who knows a

15

fellow inmate or guard has seen the photographs without permission may become violent" and "insults—intended or perceived—from inmates who see the photographs (even with permission) may lead to violence." *Id.* at 1054–55. As to the second *Turner* factor, the *Giano* court found that "'other avenues' remain available for the exercise of the asserted right," citing "commercially produced erotica and sexually graphic written notes from wives or girlfriends [as] adequate substitutes for semi-nude personal photographs." *Id.* at 1056. Turning to the third *Turner* factor, the *Giano* court found that "if [the plaintiff's] claim is accorded full constitutional protection, it will, perforce, have an adverse impact on guards, other inmates[,] and prison resources," because "[i]ncreased violence among inmates has a direct adverse impact on the inmates involved, and a ripple effect on other inmates, prison staff[,] and prison resources." *Id.* Finally, as to the fourth *Turner* factor, the *Giano* court found that "obvious, easy alternatives to the policy do not exist," noting that the plaintiff's suggestion of "allowing possession, but prohibiting inmates from displaying the personal photos in their cell and from distributing them to other prisoners . . . cavalierly disregards the informed judgment of prison officials regarding the ease with which such photos could fall into other inmates' hands and lead to violence." *Id.* The Second Circuit therefore found that Clinton Correctional Facility's policy of prohibiting nude or semi-nude photographs of spouses or girlfriends did not violate the plaintiff's free speech rights, joining a series of other circuit courts which had by that point upheld very similar policies. *See id.* at 1053–54.

In *Reynolds*, the Second Circuit considered a Connecticut Department of Corrections ("DOC") policy that limited inmate access to sexually explicit materials, including but not limited to "pictorial depictions of nudity," defined as "the visual depiction or display of genitalia, public region, anus[,] or female breast where the areola is visible and not completely and

opaquely covered." *Reynolds*, 25 F.4th at 80–81.  DOC had instituted this policy in 2012, before

which "sexually explicit materials, especially pictorial depictions of nudity and sexual acts, were

ubiquitous in DOC facilities" and had "contributed to a very threatening environment for staff."

*Id.* at 79 (quotation marks omitted).  DOC therefore found that the policy—known as A.D.

10.7—"was necessary, from a practical standpoint, to achieve DOC's objectives of (1) enhancing

the safety, security, and order of prison facilities, (2) supporting the rehabilitation of the inmate

population, and (3) reducing the exposure of DOC staff to displays of sexually explicit materials

in the workplace, thereby seeking to avoid a hostile work environment, particularly for staff."

*Id.* at 80 (alterations and quotation marks omitted).  A group of seven plaintiffs challenged the

constitutionality of the policy under the First Amendment and after holding a bench trial, the

district court concluded that A.D. 10.7 did not violate the plaintiffs' rights under the First

Amendment after consideration of the *Turner* factors.  *See id.* at 82.

On appeal, the Second Circuit agreed.  *See id.* at 82–95.  As to the first *Turner* factor, the

*Reynolds* court found that "A.D. 10.7 is rationally related to several penological interests[:]

promoting a non-hostile work environment for corrections staff, enhancing the safety and

security of DOC facilities, and facilitating the rehabilitation of sex offenders in DOC facilities."

*Id.* at 85.  As to the second *Turner* factor, the *Reynolds* court cited *Giano* in finding that

"although a sexually-suggestive television show or a sexually-explicit novel may be an imperfect

substitute for *Playboy*, . . . the alternatives available in DOC facilities for the receipt of sexually

explicit communications, as well as pictorial materials with sexual content that . . . are outside

the definition of 'sexually explicit' are sufficient for us to conclude that 'other avenues remain

available for the exercise of the asserted right.'"  *Id.* at 92–93 (quoting *Giano*, 54 F.3d at 1056).

Turning to the third *Turner* factor, the *Reynolds* court found that the evidence adduced at the

bench trial had demonstrated that "a ripple effect on staff and inmates from the assertion of [the right at issue] had already been experienced and documented for many years within DOC facilities prior to the implementation of A.D. 10.7." *Id.* at 93.  Finally, as to the fourth *Turner* factor, the *Reynolds* court found that there were no obvious, easy alternatives to the policy, crediting the district court's holding that "the fact that numerous other correctional systems employ similar bans on sexually explicit publications is further evidence that there are no obvious, easy alternatives to the 2012 ban at issue here." *Id.* at 94.  Therefore, the Second Circuit in *Reynolds* again found that a policy of prohibiting, inter alia, nude or semi-nude photographs did not violate the plaintiffs' free speech rights, joining even more circuit courts which have now upheld very similar policies.  *See id.* at 84 (citing, inter alia, *Jones v. Salt Lake County*, 503 F.3d 1147 (10th Cir. 2007); *Mauro v. Arpaio*, 188 F.3d 1054 (9th Cir. 1999) (en banc); *Waterman v. Farmer*, 183 F.3d 208 (3d Cir. 1999); *Amatel v. Reno*, 156 F.3d 192 (D.C. Cir. 1998); *Fauconier v. Clarke*, 709 F. App'x 174 (4th Cir. 2018) (per curiam); *Josselyn v. Dennehy*, 333 F. App'x 581 (1st Cir. 2009) (per curiam)).

In its first Opinion, this Court held that "Plaintiffs cannot state a cognizable claim for violation of their First Amendment free speech rights via the application of [DOCCS' policies] to the photographs and videograms that they attempted to receive."  (Op. 19.)  JPay and DOCCS Defendants both argue that "Plaintiffs . . . have once again asserted a First Amendment claim without alleging any additional facts that would distinguish between their First Amendment claim under the original Complaint and the Amended Complaint."  (JPay Mem. 10; *see also* DOCCS Mem. 4–6 ("The Court has already determined that Second Circuit precedent has squarely foreclosed Plaintiff[s'] First Amendment free speech claim.  Plaintiffs' continued assertion in the Amended Complaint that the videos and photos are sent via a secured network

and on a password protected device has already been rejected by the Court as immaterial.").)
The Court agrees.

Plaintiffs have not alleged any additional facts that could possibly raise a First
Amendment claim.  Even if Plaintiffs did provide additional factual allegations, *Giano* and
*Reynolds* "squarely foreclose Plaintiff[s'] First Amendment free speech claim."  (Op. 19.)  "The
policy at issue here is a DOCCS policy which prohibits the possession of photographs and
videograms containing nudity, defined as 'the showing of the human male or female genitals,
pubic area[,] or buttocks with less than a full opaque covering, of the female breast with less than
a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of
covered male genitals in a discernibly turgid state,' on the grounds that 'the possession of nude
photographs presents a clear threat to the safety, security[,] and good order of the correctional
facility.'"  (Op. 19; *see also* FAC Ex. E, at 32.)  As discussed in the previous Opinion, the
Second Circuit "squarely held in *Giano* that an identical policy, designed with the same
considerations in mind [as those at issue in the instant Action], does not constitute a violation of
inmates' First Amendment free speech rights."  (Op. 19 (citing *Giano*, 54 F.3d at 1051–57).)  In
addition, the Second Circuit held in *Reynolds* that "a materially similar policy, designed with
many of the same considerations in mind, does not constitute a violation of inmates' First
Amendment free speech rights."  (*Id.* (citing *Reynolds*, 25 F.4th at 80–95).)

As was the case in the first Motion to Dismiss, the Court does not find any of Plaintiffs'
arguments in opposition to be persuasive.  First, Plaintiffs cite out-of-circuit precedent to argue
that law of the case doctrine should not apply "when manifest injustice would result in
precluding this Court from reassessing its own legal rulings."  (Pl's Mem. 4 (citing *Askins v. U.S.*

*Dept. of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018).)[4]  In *Askins*, the Ninth Circuit found that a district court erred in dismissing an amended complaint as barred by the law of the case doctrine, as the district court "should simply have considered the amended complaint on its merits."  *Askins*, 899 F.3d at 1043.  Assuming arguendo that this Ninth Circuit precedent must guide this Court (which it does not), here, the Court is indeed considering Plaintiffs' amended complaint on its merits.  And, on its merits, Plaintiffs have failed to provide any factual allegations that would distinguish *Giano* and *Reynolds*.  Second, Plaintiffs raise the exact same argument in response to the instant Motions as they did in previous motions practice, stating that "Defendant[s'] particular interest is an invalid reason when Plaintiff's tablet is password protected and no other inmate ha[s] access to their password or tablet."  (Pl's Mem. 5.) However, "the Court sees no reason why a password-protected photograph or videogram could not be voluntarily shared among inmates and potentially lead to the very violence that the DOCCS policy is designed to prevent[,]" (*see* Op. 20), a rationale which was specifically credited by the Second Circuit in *Giano*.  *See Giano*, 54 F.3d at 1054–55 (stating that "insults— intended or perceived—from inmates who see the photographs (even with permission) may lead to violence")).

Plaintiffs have not pled any factual allegations to sustain a First Amendment free speech claim.  Accordingly, Plaintiffs' First Amendment free speech claim is dismissed.

### 2.  Fourteenth Amendment Equal Protection Claim

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (same).  "[T]o

---

[4] The Court cites to the ECF-stamped page numbers when referring to Plaintiffs' memorandum in opposition.

assert an equal protection claim, a plaintiff must plead (1) adverse treatment 'compared with similarly situated individuals,' and (2) 'that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"  *Marom v. Town of Greenburgh*, No. 13-CV-4733, 2015 WL 783378, at *9 (S.D.N.Y. Feb. 23, 2015) (quoting *Miner v. Clinton Cnty.*, 541 F.3d 464, 474 (2d Cir. 2008)); *see also Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (holding that a plaintiff must allege "that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination" (citation omitted)).  "If the plaintiff is not a member of a protected class, a 'class of one' equal protection claim requires that (1) he was treated differently from others similarly situated in all relevant respects, (2) the defendant had no rational basis for the different treatment, and (3) the different treatment resulted from a non-discretionary state action."  *Marom*, 2015 WL 783378, at *9 (citing *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 604 (2008)); *see also Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59–60 (2d Cir. 2010) ("Class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves. Accordingly, to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person would regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." (quotation marks and citation omitted)).

Importantly, it is well settled that "prisoners either in the aggregate or specified by offense are not a suspect class," *Graziano v. Pataki*, 689 F.3d 110, 117 (2d Cir. 2012) (quotation

marks omitted); *see also Benjamin v. Jacobson*, 172 F.3d 144, 165 (2d Cir. 1999) ("[P]risoners are not a suspect class."), and Plaintiffs have still entirely failed to allege that they possess any other characteristic that led to any manner of differential treatment, as they failed to do in their initial Complaint.  (*See generally* FAC.)  This is fatal to their equal protection claim.  *See, e.g.*, *Harris v. Nassau Cnty.*, No. 13-CV-4728, 2016 WL 3023265, at *5 (E.D.N.Y. May 24, 2016) (explaining, in pro se case, that "[t]o set forth factual allegations sufficient to state an equal protection claim, the plaintiff . . . cannot rely on conclusory allegations devoid of factual support"); *Dellutri v. Vill. of Elmsford*, 895 F. Supp. 2d 555, 572–73 (S.D.N.Y. 2012) (finding equal protection claim to be subject to dismissal where "[t]he totality of [the] [p]laintiff's allegations regarding his [e]qual [p]rotection claim is a conclusory assertion, without any detail, that [the] [d]efendant differed in its 'treatment to other similarly situated property owners'" (collecting cases)); *cf. Giano*, 54 F.3d at 1057 (finding, on summary judgment, that where "[the plaintiff] presents no evidence that the policy [against allowing nude photographs] discriminated against a particular class of inmates," and "[i]n fact, [the] policy was applied to all inmates," that "[the plaintiff's] equal protection claim fails").

Accordingly, Plaintiffs' equal protection claim is dismissed.

### 3.  Fourteenth Amendment Due Process Claim

"In order to prevail in an action based on § 1983 and the Fourteenth Amendment, a prison inmate must demonstrate a deprivation of a liberty interest protected by the Due Process Clause itself, or a violation of a state-created liberty interest." *Davis v. Collado*, No. 16-CV-7139, 2018 WL 4757966, at *9 (S.D.N.Y. Sept. 30, 2018) (citation omitted).  "To present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (alteration omitted) (quoting *Giano v. Selsky*, 238 F.3d 223,

225 (2d Cir. 2001)).  The Second Circuit has made clear that "[t]he Due Process Clause does not protect against 'every change in the conditions of confinement having a substantial adverse impact' on inmates if those changes are 'within the normal limits or range of custody which the conviction has authorized the State to impose.'"  *Arce v. Walker*, 139 F.3d 329, 333 (2d Cir. 1998) (citation omitted) (quoting *Sandin v. Conner*, 515 U.S. 472, 478 (1995)).  "Instead, the Due Process Clause protects against restraints or conditions of confinement that 'exceed the sentence in an unexpected manner.'"  *Id.* (alterations omitted) (quoting *Sandin*, 515 U.S. at 484).

Construed liberally, Plaintiffs allege a restraint in their confinement based in Defendants' interpretation of DOCCS Directives Nos. # 4572 and 4425, stating that they are "arbitrary [and] capricious to allege a threat to safety, security, and order of facility" despite the fact that JPay tablets are secured and password protected.  (FAC 12.)  However, it is clear that access to videos and photographs are not "atypical and significant hardships" protected by the Fourteenth Amendment.  *Palmer v. Richards*, 364 F.3d 60, 64–66 (2d Cir. 2004).  While the Court has not identified an identical case previously before courts in the Second Circuit, several courts have found that similar, inconsequential denials that fail to amount to an atypical hardship.  *See, e.g.*, *Green v. Venettozi*, No. 14-CV-1215, 2018 WL 7917917, at *25 (N.D.N.Y. Nov. 21, 2018) (collecting cases to determine that "plaintiff's claims concerning publications, haircuts, law library requests, photo services, and contact visits fail to amount to an atypical hardship."), *report and recommendation adopted*, 2019 WL 624922 (N.D.N.Y. Feb. 14, 2019); *Rosales v. LaValley*, No. 11-CV-106, 2014 WL 991865, at *11 (N.D.N.Y. Mar. 13, 2014) ("It is well established that prison inmates do not have a constitutional right to watch television because the amenity is not considered a necessity for inmates."); *White v. Fischer*, No. 9-CV-240, 2010 WL 624081, at *6 n.8 (N.D.N.Y. Feb. 18, 2010) (dismissing plaintiff's allegations of "a litany of

differences" between the conditions at different prison facilities, including that he was "was not permitted to take photographs" could not, as a matter of law, "be characterized as exceeding his sentence in an unexpected manner or as imposing an atypical and substantial hardship upon the plaintiff in relation to the ordinary incidents of prison life" (alterations and quotation marks omitted)).  Indeed, courts have found that far greater restraints on an incarcerated individual's freedom have not implicated a liberty interest protected by the Constitution.  *See, e.g.*, *Palmer*, 364 F.3d at 64–66 (finding that Special Housing Unit ("SHU") confinement for fewer than 101 days will not presumptively implicate an inmate's liberty interest unless that confinement is accompanied by "atypical and significant hardships").

In Opposition, Plaintiffs do not address the lack of liberty interest as raised by the DOCCS and JPay Defendants.  (*See generally* Pl's Mem.)  Instead, Plaintiffs argue that "DOCCS Defendants have violated Plaintiff[s'] and community senders Due Process rights" because DOCCS did not notify Plaintiffs of the rejected videos and these denials were "not in accordance with" Directive No. #4752 by "misapplying Penal Laws" regarding nudity.  (*Id*. at 4–5.)  However, even if Plaintiffs had established a liberty interest, JPay correctly points out that Plaintiffs have failed to adequately allege that they were denied due process.  (*See* JPay Mem. 14.)  Despite Plaintiffs' assertion that DOCCS did not notify Plaintiffs of the rejected videos, it is clear based on Plaintiffs' own pleadings that they received some notice as they took advantage of the grievance process.

Here, Plaintiffs, by their own admission, have already had several opportunities to litigate this issue once they did become aware of the rejected videograms and photos.  (*See* FAC 7–9.)  Specifically, Plaintiffs filed grievance complaints, received a grievance hearing, appealed the denial of their grievances, and additionally wrote directly to Annucci concerning the issue.  (*See*

*id.*)   Moreover, "it is well-established that inmates do not have a protected liberty interest in the processing of their prison grievances."  *Cunningham v. Agro*, No. 15-CV-1266, 2023 WL 2647105, at *3 (S.D.N.Y. Mar. 27, 2023) (citing *Monroe v. Gerbing*, No. 16-CV-2818, 2017 WL 6614625, at *14 (S.D.N.Y. Dec. 27, 2017)).  Further, "inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim."  *Id*. (citing *Njasang Nji v. Heath*, No. 13-CV-200, 2013 WL 6250298, at *6 (S.D.N.Y. Dec. 2, 2013)).

Accordingly, Plaintiffs' due process challenge is dismissed.

### 4.  Void for Vagueness Claim[5]

"As the Supreme Court has explained, under the Due Process Clause, 'the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'"  *Reynolds*, 25 F.4th at 96 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).  "Therefore, 'the challenger can prevail

---

[5] Again, Plaintiffs have ostensibly brought their void-for-vagueness challenge under the First Amendment.  (*See* FAC 12 (stating a third cause of action for "violation of Plaintiffs' First Amendment Right because the policy is unconstitutionally vague and denies due process").)  A void-for-vagueness challenge is properly brought under the due process clause of the Fifth and Fourteenth Amendments.  *See Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."); *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) ("It is well-established that the Fourteenth Amendment . . . ensures that the individual need not speculate as to the meaning of penal statutes and is entitled to be informed as to what the State commands or forbids.  As one of the most fundamental protections of the Due Process Clause, the void-for-vagueness doctrine requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." (quotation marks and citations omitted)).  Accordingly, the Court construes Plaintiffs' void-for-vagueness challenge as brought under the Fourteenth Amendment.

by showing that the statute either fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or authorizes or even encourages arbitrary and discriminatory enforcement.'" *Id.* (quoting *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018)); *see also Giano*, 54 F.3d at 1057 ("A statute is unconstitutionally vague if persons of common intelligence must necessarily guess at its meaning and differ as to its application, or if it fails to give a person of ordinary intelligence fair notice of conduct proscribed or required by the regulation, and encourages arbitrary and erratic behavior on the part of officials charged with enforcing the rule." (citations omitted) (first citing *Connally*, 269 U.S at 391, then citing *United States v. Harriss*, 347 U.S. 612, 617 (1954), and then citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972))). While the void-for-vagueness doctrine is most classically applicable to criminal statutes, the Second Circuit in *Reynolds* made clear that a vagueness challenge can stand against a prison regulation, even if violation of the regulation at issue does not carry concomitant disciplinary consequences, though "[l]aws with civil consequences receive less exacting vagueness scrutiny." *Reynolds*, 25 F.4th at 95–96 (quotation marks omitted).

Here, Plaintiffs have broadly claimed that the DOCCS policies at issue are "unconstitutionally vague" because Directives #4572 and #4425 do not "factor in that the videograms and photo[s] are stored on a secured password protected J[P]ay tablet, that no other person has access to [Plaintiffs'] tablet[s], and there is no security [distinction] between nude commercial material such as books[] and magazines, versus electronic correspondences of nudity, which is allowed after the facilities media review committee deems such material appropriate." (FAC 12.) However, in making this claim, Plaintiffs have not identified any specific language or provisions of any DOCCS policy that "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or authorizes or

even encourages arbitrary or discriminatory enforcement[,]" *Reynolds*, 25 F.4th at 96, beyond conclusorily stating that DOCCS "utilize[es] vague guidelines to prohibit videograms that present[] no threat to orderly facility operations[,]" (Pl's Mem. 5).  Moreover, the Second Circuit in *Giano* held that Clinton Correctional Facility's policy, which, again, is identical to the policy at issue here, was not unconstitutionally vague, foreclosing relief on this claim.  *See Giano*, 54 F.3d at 1057 (reciting CORC's definition of "nudity" and holding that "[a] person of ordinary intelligence would understand this policy"); *see also Reynolds*, 25 F.4th at 96 ("Given the clear and specific definitions of both 'sexual activity' and 'nudity,' there is no doubt that a person of ordinary intelligence would understand which pictorial materials fell within these definitions.")

Accordingly, Plaintiffs' void-for-vagueness challenge is dismissed.[6]

---

[6] Given the Court's conclusions that Plaintiffs have failed to state a claim for violation of their First Amendment free speech rights, violation of their Fourteenth Amendment equal protection and due process rights, or violation of their Fourteenth Amendment due process rights, the Court need not—and will not—address any of the Parties' other arguments to dismiss the Complaint in its entirety.

III.  Conclusion

For the foregoing reasons, the Motions are granted.  Because this is the second adjudication of Plaintiffs' claims, the claims are dismissed with prejudice.  The Clerk of Court is directed to terminate the pending motions, (*see* Dkt. Nos. 84, 87), mail copies of this Opinion & Order to Plaintiffs at the addresses listed in the docket, and close the case.

SO ORDERED.

Dated:  June 20, 2023
        White Plains, New York

_____
        KENNETH M. KARAS
        United States District Judge